# Wytheville

GEORGE S. KEMP, ET ALS. V. ALFRED LEVINGER.

June 14, 1934.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*Smith & Gordon* and *Leon M. Nelson,* for the appellants.

*Wirt P. Marks, Jr.,* and *Hunton, Williams, Anderson, Gay & Moore,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

This appeal brings up for review a controversy over the respective rights of the different classes of stockholders

under the charter of Virginia-Carolina Chemical Corporation, a corporation organized under the laws of this Commonwealth.

This corporation was chartered March 24, 1926, as the result of a plan and agreement to reorganize Virginia-Carolina Chemical Company, a New Jersey corporation, then in receivership. The maximum number of shares authorized by the charter was 1,109,711, divided into three classes, *i. e.*, 144,871 shares of the par value of $100, each, seven per cent cumulative dividend prior preference stock (hereafter called prior preference stock), 214,840 shares of the par value of $100, each, six per cent cumulative dividend participating preferred stock (hereafter called preferred stock) and 760,000 shares of common stock, without nominal or par value.

It appears from the plan and agreement of reorganization that the New Jersey company owed outstanding first mortgage seven per cent bonds in the principal sum of $24,348,000 and had $19,500,000 of liquid assets, which together with other properties of the company were valued at $40,000,000. The reorganization plan provided that the holder of each $1,000 first mortgage bond of the old company should receive $510 in cash and $595 par amount of prior preference stock of the new company, so that 144,-871 shares of prior preference stock of the new company were required to discharge the bonds of the old company.

When the transfer of the properties of the old company was finally consummated the new corporation had issued the total authorized number of shares of prior preference stock and preferred stock and 486,700 shares of common stock. It is apparent that if the holders of the first mortgage bonds of the old company had refused to sign the reorganization agreement they would have eventually received the principal sum due, including past due interest. As an inducement to them to participate in the reorganization, certain unusual rights and privileges were accorded the holders of the prior preference stock in the

new company, among which was a charter provision, article 4, section 5, reading thus:

"The prior preference stock shall have full voting rights, each share to entitle the holder thereof to one vote; but, so long as the prior preference *stock outstanding* shall be in excess of $10,000,000 par amount, the holders of the prior preference stock shall have the right, voting separately as a class, to elect a majority by one of the directors of the corporation." (Italics supplied.)

Prior to October 11, 1933, the date fixed for the annual meeting of stockholders, the corporation, pursuant to resolutions of the directors, had purchased and held in the treasury 84,871 shares of prior preference stock and 1,087 shares of preferred stock. At this meeting the stock outstanding and entitled to vote and the number of shares of the several classes of stock of the company represented in person or by proxy were ascertained to be as follows:

| | | Present | | Outstanding and Entitled to Vote |
|---|---|---|---|---|
| 7% prior preference stock—In person | | 6,509 | | |
| | By proxy | 27,112 | | |
| | Total......... | | 33,621 | 54,439 |
| 6% Preferred............ | In Person | 684 | | |
| | By proxy | 52,541 | | |
| | Total..... .... | | 53,225 | 212,887 |
| Common................ | In person | 1,002 | | |
| | By proxy | 95,703 | | |
| | Total.......... | | 96,705 | 481,217 |
| Combined totals...................... | | | 183,551 | 748,543 |

The chairman of the meeting declared that there was present in person or by proxy a quorum of prior preference stock, but not a quorum of preferred and common stock. He further stated that the holders of the prior preference stock had the right to proceed with the election of a majority by one of the directors, and for lack of a quorum of all the stockholders no other business could

be transacted. The prior preference stockholders thereupon proceeded to elect the eight appellants, who constituted a majority by one of the number of directors authorized, and the meeting adjourned to November 10th for the purpose of securing the attendance in person or by proxy of a majority of all classes of stock with voting power.

Alfred Levinger, the owner of some 400 shares of preferred stock, was present at this meeting and objected to the prior preference stockholders electing directors, on two grounds, (1) because there was not a quorum of all stock of the corporation present in person or by proxy, and (2) that the right given in the certificate of incorporation to prior preference stockholders to elect a majority of the directors no longer existed because the purchase of this class of stock by the corporation reduced the amount outstanding below $10,000,000 par amount. When his protests proved unavailing, he, claiming to represent a partnership, participated in the meeting of the prior preference stockholders and, under protest, voted 3,100 shares of this class of stock.

Following this meeting, the eight appellants called a meeting of the directors of the corporation to be held on the 17th day of October for the purpose of assuming the duties of directors.

Immediately thereafter, Alfred Levinger filed his bill in the Chancery Court of the City of Richmond, alleging that the election of appellants was illegal and void on the grounds stated, praying that they be enjoined from exercising any functions or duties of directors and for reinstatement of the former board of directors and officers of the company. A temporary injunction was granted, which on a final hearing was made permanent. From that decree this appeal was allowed.

. It is conceded that the par amount of prior preference stock outstanding and held by the public is less than.$10,000,000, i. e., $5,443,900, exclusive of fractional shares not entitled to vote, that the difference, 84,871 shares, has been

purchased by the corporation and is now held as treasury stock.

The main question presented is whether the prior preference stockholders have lost their right to elect a majority by one of the directors. This question must be determined by proper interpretation of the charter. There is practically no dispute as to the rules of construction applicable, which are admirably summarized by the learned chancellor in his opinion, thus:

"The charter, or articles of association, is a contract between the corporation and the stockholders, and between the stockholders themselves. *Winfree* v. *Riverside Cotton Mills,* 113 Va. at page 722, 75 S. E. 309.

"In construing this charter it is necessary to bear in mind that the object of construction in all cases is to ascertain the intention of the parties, or more properly speaking, the meaning of the instrument; for courts are bound to say that the parties intend what the written instrument declares. It not infrequently happens that the courts have to settle the construction of a contract in regard to questions which never occurred to the parties to it. Courts shall best carry out their intentions by construing their language neither strictly nor liberally, but fairly, and this is generally the true rule.

"The court must also bear in mind the subject-matter of the contract, and the intention and purposes of the parties in making it, and should carry that intention into effect so far as the rules of language and the rules of law permit. *White* v. *Sayers,* 101 Va. 826, 45 S. E. 747; *Shenandoah Land & Anthracite Coal Co.* v. *Hise,* 92 Va. 238, 23 S. E. 303; *Bank of U. S.* v. *Beirne,* 1 Gratt. (42 Va.) 263, 42 Am. Dec. 551, and other cases. The supreme court of Massachusetts in 1929, in the case of *Brown* v. *Little, Brown & Co.,* 269 Mass. 102, 168 N. E. 521, 66 A. L. R. at page 1291, in construing the charter of the corporation said:

" 'The significance of words of doubtful import, or susceptible of different meanings, may take color from

the time and circumstances of their use and the presumed intention of the parties in connection with all attendant conditions.

 " 'Every instrument in writing is to be interpreted in the light of all pertinent facts within the knowledge of those who signed it, and in such manner as to give effect to the main end desired to be accomplished. Words of a writing are to be construed according to the common and approved usage of the language and are not to be wrested from their usual sense to meet an exigency not foreseen when the instrument was drafted.' Citing: *Eustace* v. *Dickey,* 240 Mass. 55-72, 132 N. E. 852; *Moss* v. *Old Colony, etc.,* 246 Mass. 155, 140 N. E. 803; *Erickson* v. *Ames,* 264 Mass. 444, 163 N. E. 70."

 It is in the application of the principles to the facts and certificate of charter upon which the parties sharply differ. As heretofore stated, the purpose and intent of the managers of the reorganization of the old New Jersey company was to offer unusual inducements to the holders of the first mortgage bonds, in order to get them to accept in part payment of their bonds prior preference stock in the new company. These rights and privileges are set forth in article 4 of the certificate of incorporation, and may be summarized thus:

(1) The right to receive out of the surplus or net earnings, when and as declared by the board of directors, seven per cent annual cumulative dividends from June 1, 1925, in priority to payment of dividends upon any other class of stock.

(2) Upon a voluntary dissolution, liquidation or distribution of assets, there should be paid for each share of the prior preference stock the sum of $110, plus accumulated dividends; upon an involuntary dissolution, distribution or liquidation there was to be paid for each share the sum of $100, plus all unpaid accumulated dividends, whether or not earned or declared, before payment of any sum to or on account of the preferred or common stock.

(3) The prior preference stock, at the option of the board of directors, was redeemable in whole or in part, but in such case the holder of each share was entitled to receive $110, plus all unpaid dividends, whether or not earned or declared. "All prior preference stock so redeemed shall be canceled and retired in such manner as may be prescribed by law, and no prior preference stock so redeemed shall be reissued."

(4) After provision for the payment of all accumulated dividends on the prior preference stock from June 1, 1925, at the rate of seven per cent, and on the preferred stock at the rate of six per cent from July 1, 1927, there should be set aside as a sinking fund for the purpose of redeeming the prior preference stock, twenty-five per cent of the net earnings for the preceding fiscal year, and also alternate methods for acquiring the stock.

(5) "The prior preference stock shall have full voting rights, each share to entitle the holder thereof to one vote; but so long as the prior preference stock outstanding shall be in excess of $10,000,000 par amount, the holders of the prior preference stock shall have the right, voting separately as a class, to elect a majority by one of the directors of the corporation.

(6) "Without the affirmative vote or written consent of the holders of at least two-thirds of the prior preference stock at the time outstanding, the corporation shall not (a) increase the authorized amount of the prior preference stock, or create any stock on a parity with or having priority over the prior preference stock, or alter or change the preferences of such prior preference stock or the right of the holders thereof to elect, as provided in the foregoing paragraph 5, a majority by one of the directors of the corporation, or (b) redeem any shares of the preferred stock of the corporation, or (c) create any mortgage, lien or other encumbrance upon any of the property or assets of the corporation * * * ," with certain exceptions.

The right of the prior preference stockholders to elect

a majority of the directors is made dependent upon the condition that the outstanding par amount of this stock exceeded $10,000,000. The charter provided three methods by which this right might be extinguished; (a) by redemption of the stock below that amount, in which event the corporation would have to pay for each share of stock so redeemed $110, plus unpaid dividends, whether or not earned or declared; (b) by purchase of a like amount of stock out of a sinking fund which should be set aside for the purpose; (c) by the affirmative vote or written consent of at least two-thirds of the holders of prior preference stock.

It is conceded that neither one of the above methods was pursued. Appellee contends that under the laws of this Commonwealth the right might be extinguished in another way, i. e., by the corporation purchasing a sufficient amount of this stock to reduce the amount outstanding in the hands of the public to $10,000,000, or less.

He does not contend that the contract rights of the prior preference stockholders could be changed by the board of directors without the given consent of the requisite amount of prior preference stock outstanding, as required by the charter and the laws of this Commonwealth, but urges that Code, section 3777 (k), as amended by Acts 1928, ch. 385, confers upon every Virginia corporation the authority "to exercise all other powers granted to corporations generally by the laws of this State," that among the powers so conferred is the right to purchase and hold in its treasury its own capital stock, and that the valid exercise of this power brought about a change in the condition under which the prior preference stock was authorized to elect a majority of the directors.

In support of this contention he cites the case of *United States Mineral Co.* v. *Camden and Driscoll*, 106 Va. 663, 56 S. E. 561, 117 Am. St. Rep. 1028, where the broad principle is anounced that " * * * the prevailing doctrine in the United States (is) that corporations may purchase, hold and sell shares of their own stock provided they act in good faith and without intent to injure their creditors."

This contention requires a review of the Virginia decisions on the point. The first case to which our attention has been called is *Rivanna Navigation Co.* v. *Dawsons*, 3 Gratt. (44 Va.) 19, 46 Am. Dec. 183, where it was held that a bequest to a corporation of its own stock was valid. In that case it was said " * * * that the acquisition by the company in its corporate character of some of its shares, produces no union thereof with the shares owned by others; nor can it prevent the corporation from selling out the shares so acquired whenever its duty demands it."

In *Augsburg Land & Improvement Co.* v. *Pepper*, 95 Va. 92, 27 S. E. 807, 808, it appears that after the stockholders had determined to dissolve the corporation one C. T. Pepper made a contract with certain directors whereby he agreed to sell and the directors, for the corporation, agreed to buy the shares of stock owned by him. Judge Riely, delivering the opinion of the court said: "The directors can make no disposition of the corporate property which shall not inure to the equal benefit of all the stockholders. Such an act would be not merely *ultra vires*, but a fraud upon the other stockholders."

In *United States Mineral Co.* v. *Camden and Driscoll, supra*, the facts were that Camden and Driscoll made a contract with the corporation to sell it a certain tract of land for the agreed price of $5,000, $2,500 to be paid in cash and $2,500 in capital stock. A part of the agreement was if the vendors within four months from the date of agreement became dissatisfied with the stock the company would repurchase it at the same price. Within the stated period, Camden and Driscoll offered to return the stock and demanded $2,500 therefor. The company refused to comply with the terms of the agreement. Thereupon action was instituted on the contract and recovery allowed. The rule announced in that case seems to have been followed in *Kennerly* v. *Columbia Chemical Corporation*, 137 Va. 240, 119 S. E. 265.

In *Marshall* v. *Fredericksburg Lumber Co., ante*, page 136, 173 S. E. 553, 557, this court held such purchases in-

valid, on the ground that the right of creditors to have their debts paid out of the assets of the corporation is superior to the rights of the stockholders. Judge Gregory, in delivering the opinion in the latter case said: "Such property (assets of the corporation) must be devoted, primarily, to the satisfaction of creditors and is subject to their rights; secondarily, to the stockholders, in proportion to their interests. As to it, the creditors have a prior exclusive equity. In other words, stockholders have no right to anything but the residuum of the capital after the payment of all corporate liabilities."

In *Grace Securities Corp.* v. *Roberts,* 158 Va. 792, 164 S. E. 700, 703, this is said: "There are current two inconsistent doctrines on the subject. One is that it is inherently illegal, in the absence of statutory authority, for a corporation to purchase its own stock. The other is, that a corporation may buy its own stock, if the interest of creditors be not adversely affected, and if its power to buy be not restricted by its charter or by general law.

\* \* \* \* \* \* \* \*

"We deem it useless to enter into a discussion of the various circumstances under which courts have enforced or refused to enforce such a contract.

\* \* \* \* \* \* \* \*

" \* \* \* The defendant did not see fit to introduce in evidence its charter, nor is it proven that the defendant owes any debts, or that it had the right to issue and did issue more than one class of stock, or show that any stockholder would be affected by the enforcement of the contract with plaintiff other than to state that the market value of the stock had depreciated. These were affirmative defenses and unless proven we cannot consider them."

From the above, the conclusion is foreshadowed that if the power to purchase its own stock is restricted by the charter of the corporation and purchase is made in violation of the restriction, or if it is established that substantial rights of stockholders are adversely affected thereby, such contracts will be declared invalid.

Appellee contends that there are no charter provisions which prevent the corporation from purchasing its own capital stock; that the provisions for redemption of the stock and the creation of a sinking fund were nothing more than a compliance with Code, section 3792, as amended by Acts 1928, ch. 456, which authorizes corporations to redeem any and all classes of preferred stock at a fixed price, not less than par, provided that such provision be set forth in the charter; that a sinking fund provision in a mortgage securing corporate bonds, or other evidence of debt, and in a charter, with respect to stock of preferred classes, is "unusually common and entirely familiar" and merely assures to the owner of the indebtedness, on the one hand, and the owner of the preferred stock, on the other, that when the corporation has net earnings a specific part thereof will be set aside in a sinking fund and used to retire these obligations.

The fact that a statute prescribes the conditions upon which certain things may be done, or that other stipulations are common and well-known to the business world, does not make them any the less significant and binding when either, or both, are set forth in a contract whereby the parties are bound. These provisions in the charter were adopted for the benefit of prior preference stock and constituted an assurance to purchasers that the stock would be redeemed only at a premium, and a sinking fund set apart out of the net earnings, for their benefit, before any dividend would be paid to the holders of common stock, which was of no par value and issued merely to "sweeten the kitty." There was a further provision that stock so acquired by the corporation should be canceled, and not subject to re-issue.

The fact that the charter expressly authorizes the corporation to purchase its prior preference stock in one of two ways, only, is a limitation or restriction on its power to purchase this class of stock in any other way.

"In considering whether or not a contract is beyond the power of a corporation, it is true that what is

fairly implied in the charter is as much granted as what is expressed, but the charter still remains the measure of the powers of the corporation, and the enumeration of the powers implies the exclusion of all others." *National Car Advertising Co.* v. *Louisville & Nashville R. R. Co.,* 110 Va. 413, 66 S. E. 88, 89, 24 L. R. A. (N.S.) 1010. See *New York Firemen Insurance Co.* v. *Ely,* 5 Conn. 560, 13 Am. Dec. 100; *Pratt* v. *Short,* 79 N. Y. 437, 35 Am. Rep. 531; *Hotchkin* v. *Third National Bank,* 219 Mass. 237, 106 N. E. 974, 975; *Barron* v. *McKinnon* (C. C. A. 1912) 196 Fed. 933; *Calumet & Chicago Canal & Dock Co.* v. *Conkling,* 273 Ill. 318, 112 N. E. 982, L. R. A. 1917B, 814; *Doty* v. *American Telephone & Telegraph Co.,* 123 Tenn. 329, 130 S. W. 1053, Ann. Cas. 1912C, 167; Thompson on Corporations (3d Ed.) vol. 1, section 326; Fletcher on Corporations (Perm. Ed.) vol. 1, section 3648.

In *In re O'Gara & Maguire, Inc.* (D. C. N. J. 1919) 259 Fed. 935, 937, the charter provided:

"The corporation may use and apply its surplus earnings or accumulated profits to the purchase or acquisition of property, and to the purchase or acquisition of its own capital stock from time to time to such extent, and in such manner, and upon such terms as its board of directors shall determine, * * *"

From the opinion in the above case it appears that in April, 1915, the corporation purchased some of its own stock and gave three notes in payment therefor. Some nine months later, the corporation was adjudged bankrupt and the holder of the notes presented them for payment. In speaking on the issue whether or not the corporation had a right to purchase its own stock, the court said:

"The charter provisions, correctly construed, are the measure of corporate powers. This corporation could not purchase its capital stock, except out of 'surplus earnings or accumulated profits.' In the case of *Central Transportation Company* v. *Pullman's Palace-Car Co.,* 139 U. S. 24, 48, 11 S. Ct. 478, 484, 35 L. Ed. 55, the Supreme Court

said, 'The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental.' "

Viewing the charter as a contract between the corporation, on the one hand, and the prior preference stockholders, on the other, neither party, acting independently, had a right to change the conditions or stipulations of the contract. The corporation, acting through its directors, without following either of the methods prescribed by the charter, has illegally withdrawn from the public prior preference stock, so that there is now outstanding in the hands of the public less than $10,000,000 par amount.

Much is said in the briefs about the meaning of the expression, "stock outstanding," as used in the charter. A corporation is a separate entity, shares of stock are evidence of its liability and when outstanding, in the ordinary sense of the word, entitle the holder to certain rights and privileges defined in the charter and general law, such as the right to attend meetings, vote for directors, and share proportionately in the dividends declared and in the distribution of assets. Such stock once issued and later acquired by the corporation becomes what is generally known as "treasury stock." It is then not an outstanding obligation of the corporation because the obligor has become the owner of the obligation. The corporation has certainly reduced its assets by whatever amount of property it gave in exchange for the stock. It has likewise increased the proportional interest of the other share holders in the remaining assets of the corporation. In some States the franchise tax on corporations is based upon the capital stock outstanding. The question has frequently arisen whether or not treasury stock, that is stock which was actually issued but subsequently reacquired by the corporation, should be included in the term "outstanding" *quoad* the corporation and the State. In such cases, unless the stock has been formally retired, for the purpose of taxation it is usually held to be outstand-

ing. *Borg* v. *International Silver Co.* (D.C.) 11 Fed. (2d) 143, 147; *Goldstein-Fineberg Co.* v. *State Board of Assessors,* 83 N. J. Law, 61, 83 Atl. 773; *Siegman* v. *Electric Vehicle Co.,* 72 N. J. Eq. 403, 65 Atl. 910; *Knickerbocker Importation Co.* v. *State Board of Assessors,* 74 N. J. Law, 583, 65 Atl. 913, 7 L. R. A. (N.S.) 885; Cook on Corporations (2d Ed.) vol. 1, p. 939.

Some authorities hold that whether or not treasury stock so acquired is merged and extinguished, depends upon the intention with which it was acquired. *Borg* v. *International Silver Co., supra.* See Fletcher on Corporations, vol. 11, section 5148; Thompson on Corporations, vol. 5, section 4048; Virginia Law Review, vol. 15, p. 625.

If this test is applied to the case in judgment, it clearly appears that the directors did not intend to reduce the amount of prior preference stock outstanding. The greater part of this stock was acquired pursuant to authority contained in the resolution of the board of directors adopted November 18, 1932, reading thus:

"Resolved, that without intending or proposing in any way to impair, enlarge, restrict or otherwise affect the priorities, preference, or voting rights of any class of stock of this corporation, but for the purpose of investment, the proper officers of this corporation be, and they hereby are, fully authorized and directed to expend from the funds of this corporation three million dollars in the purchase of its seven per cent prior preference stock, at the price of $75 per share, said purchase to be in the following manner, to-wit: By mailing to each seven per cent prior preference stockholder of record on the 2nd day of December, 1932, a notice of this resolution and an offer to purchase from such stockholders at $75 per share forty per cent of the prior preference stock outstanding on the records of this corporation in his name at the close of business on the 2nd day of December, 1932."

A similar resolution was adopted on June 30, 1933, under which 3,300 shares of the stock were purchased at $60 per share. These resolutions were adopted and stock

bought upon the advice of counsel for the corporation, who stated that, in his opinion, "If the stock purchases were made as an investment and not for retirement, no priorities of the prior preference stockholders would be changed." Later, other counsel took the opposite view. It is interesting to note that appellee was present when both resolutions were adopted and voted for them, and was a member of a committee to arrange details and formulate plans for issuing the invitation to stockholders to tender their stock for sale to the corporation under the above resolutions.

In other words, appellee, as a director and a member of this committee, in effect, said to the prior preference stockholders, if you will sell to the corporation forty per cent of your stock, the remaining sixty per cent will still elect a majority of the directors, and hence will control the management of the corporation. He admits this, but claims that a resolution of the directors would not and could not change a charter provision. This is quite true. It was just as true before the adoption of the resolutions as it was afterwards. The action of appellee in favoring the resolutions and his subsequent action in contesting their validity leave his good faith open to serious question. Appellants contend that this inconsistent conduct of appellee estops him from maintaining this suit. In our view of the case, it is not necessary to pass upon this question.

A part of the *corpus* of the property owned by the corporation was used in the purchase of this stock. If the franchise tax was based upon the amount of capital stock outstanding, clearly the stock acquired under the circumstances narrated would be included in that term. In Virginia the franchise tax is based upon the authorized capital stock, whether or not issued and outstanding, so whether this treasury stock is outstanding *quoad* the Commonwealth is wholly academic.

Appellee contends that if this treasury stock is regarded as outstanding within the purview of this section of the

charter, such interpretation would lead to absurd results, *i. e.*, the corporation might continue to purchase with corporate funds all the remaining shares of prior preference stock, except one share, and retain them as treasury stock. This one share would elect the majority of the directors, and so retain control of the property of a corporation now valued at some $28,000,000.

This argument is based on the contention that the corporation has an unrestricted right to purchase its own shares so long as "there is no intent to injure creditors." As heretofore stated, in this Commonwealth a corporation has no right to purchase its own shares if the substantial rights of either creditors or stockholders will be adversely affected thereby. The right to elect a majority by one of the directors is a substantial right. The charter provides methods by which this right may be extinguished. The corporation had no right to bring about the change in any other way. We rest the decision of this case on this ground, rather than on a strained interpretation of the term "stock outstanding."

The chancellor held that appellants were not properly elected directors because there was no lawful meeting of the stockholders for lack of a quorum. Code, section 3802, provides that: "Shares of stock of a corporation belonging to it shall not be voted, directly or indirectly." Code, section 3796, as amended by Acts 1928, ch. 224, provides that " * * * a majority in interest of the stock having voting power, represented either in person or by proxy, shall constitute a quorum, unless otherwise provided in the charter of the corporation." * * *

The purpose of the charter provision was to provide for separate voting of the prior preference stockholders on the one hand, and the preferred and common stockholders on the other, so far as the election of directors was concerned. Neither class of stockholders, by absenting themselves from a meeting duly called, could defeat the right of the other to elect the number of directors which the charter gave them the right to elect, but these

separate meetings and separate votings were restricted to the election of directors; for the transaction of any other business a quorum of all stockholders was required. A majority of the prior preference stock having voting power was present, in person or by proxy, at the meeting on October 11, 1933. The chairman was right in his ruling that prior preference stockholders, voting as a class, had the right to elect a majority by one of the directors, and that no other business could be transacted, for lack of a quorum. See *Pierce Oil Corporation* v. *Voran,* 136 Va. 416, 118 S. E. 247.

For the reasons stated, the decree of the lower court is reversed, the injunction dissolved, and the case dismissed.

*Reversed and dismissed.*

CAMPBELL, C. J., dissenting.