**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RAPIDS CONSTRUCTION COMPANY,
INCORPORATED,
Plaintiff-Appellee,

No. 97-1239

v.

CARL O. MALONE; HARRY R. HALL,
Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-96-539-A)

Argued: October 30, 1997

Decided: March 13, 1998

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
CAMPBELL, Senior Circuit Judge of the United States Court of
Appeals for the First Circuit, sitting by designation.

_____

Affirmed by unpublished opinion. Senior Judge Campbell wrote the
opinion, in which Chief Judge Wilkinson and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Max Christian Dorian, ABRAMOWITZ & DORIAN,
Annandale, Virginia, for Appellants. Mathew David Ravencraft,
FLINN & BEAGAN, Vienna, Virginia, for Appellee. **ON BRIEF:**
James McConville, Annandale, Virginia, for Appellants. Robert F.
Flinn, FLINN & BEAGAN, Vienna, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

CAMPBELL, Senior Circuit Judge:

This is a diversity case governed, as all parties concede, by Virginia law. Rapids Construction Company ("Rapids") secured a judgment against ADCO Systems, Inc. ("ADCO"), a general contractor, for breach of a contract. After failing to collect its judgment, Rapids sued ADCO's shareholders, Harry R. Hall and Carl O. Malone, alleging, inter alia, that they had impermissibly caused the corporation to repurchase certain of its own stock in exchange for an offset to Hall's and Malone's indebtedness to the corporation. Rapids also alleged that Hall and Malone had made other improper payments to themselves and to affiliated companies. Relying in large measure on a sixty-four year-old Virginia case, Marshall v. Fredericksburg Lumber Co., 173 S.E. 553 (Va. 1934), the district court granted Rapids' motion for summary judgment on the above claims against Hall and Malone, and they now appeal.

I. Background

Defendants-Appellants Malone and Hall are directors, officers, and sole shareholders of ADCO. ADCO hired Plaintiff-Appellee Rapids as a subcontractor responsible for installing drywall in a retail store in Fairfax County, Virginia, that ADCO was building for the Guess Company.

Problems started when ADCO did not pay Rapids for its work on the Guess project. Rapids then filed an action for breach of contract in federal district court. That action resulted in a judgment against ADCO for $70,588.88, which ADCO did not pay.[1] Malone conceded

_____

[1] By the time Rapids recovered summary judgment in the instant action against Malone and Hall, mounting interest had caused the total owed by ADCO to reach $83,589.97.

2

in his deposition that two weeks before entry of that judgment, ADCO lacked sufficient funds to meet its financial obligations. At no time since then has it been suggested that ADCO was willing or able to pay the judgment.

A month or so after ADCO failed to pay Rapids' account (but prior to Rapids' action against ADCO), Hall and Malone caused ADCO to forgive $82,150 in "shareholder receivables" due from themselves in exchange for the surrender of certain stock Malone held in the company.[2] This left approximately $100,000 still owed to ADCO in the shareholders' receivables account. After Rapids obtained its judgment against ADCO, Hall and Malone shifted most of ADCO's assets to other companies and ADCO, while not formally dissolved, completely ceased doing business.

The instant case arose when Rapids was unable to collect its judgment from ADCO. Rapids brought this diversity action in the district court against Hall and Malone to recover from them the sum owed by ADCO. The complaint comprised causes of action for fraud, piercing the corporate veil, and breach of fiduciary duty. Only the final count is at issue here. That count alleged that Defendants"Malone and Hall, as directors and officers of ADCO, owed a fiduciary duty to protect and preserve the assets of ADCO for the benefit of Rapids Corporation."

At the close of discovery, Hall and Malone moved for summary judgment on all three counts, and Rapids moved for summary judgment on the count for breach of fiduciary duty. The district court granted Defendants Hall's and Malone's motion for summary judgment on the fraud count, and denied their motion on the veil-piercing count. At a subsequent trial of the veil-piercing count the court found for Hall and Malone. No appeal has been taken regarding either the fraud or veil-piercing counts.

_____

**2** While it appears that the surrendered stock was Class B stock belonging to Malone, the "shareholder receivables" account against which the value of the stock was offset related on ADCO's books to both Hall and Malone. The district court attributed the stock and the offset to both men without distinction. As it is not argued that only Malone should be held liable, we do not consider this possible issue.

3

On the fiduciary duty count, the district court granted summary judgment for $82,150 in favor of Plaintiff Rapids. That sum was the amount by which Hall and Malone's indebtedness to ADCO was reduced in return for the company's repurchase of the stock -- a transaction consummated just before Rapids secured its judgment against ADCO. The district court reasoned that "[a]t least two propositions support this judgment. The first is that the controlling shareholders of a corporation have a duty to pay the corporate liabilities to outside creditors before they may receive any of the residuum of the corporation's assets." For this proposition, the district court relied solely on the Virginia Supreme Court's decision in Marshall v. Fredericksburg Lumber Co., 173 S.E. 553, 557 (Va. 1934).

Second, the court, quoting FDIC v. Sea Pines Co. , 692 F.2d 973, 976-77 (4th Cir. 1982) (applying South Carolina law), stated "that when a corporation becomes insolvent or is in a failing condition, `the fiduciary duty of the directors shifts from the stockholders to the creditors.'"

Applying these principles, the district court concluded that Hall and Malone had breached their fiduciary duty to their creditor, Rapids. The court conceded that "[t]he solvency or insolvency of ADCO from September 1994 to the present is not clear from the record." However, the district court continued,

> at a time when defendants concede ADCO did not have sufficient funds to meet its financial obligations, and immediately prior to Rapids becoming a judgment creditor of ADCO, Malone and Hall transferred monies from ADCO to themselves and their other businesses. They also effectively dissolved the company by arranging, in January of 1995, for ADCO to buy back all of their stock for $82,150.

The stock repurchase was not merely "a purely paper transaction," as it resulted in ADCO's having exchanged Defendants' obligations to it for "stock of doubtful value" rather than "an $82,150 infusion of cash." (Id.) "These actions," the court concluded, "constituted a breach of the fiduciary duty that defendants, as ADCO's sole shareholders, owed the corporation's creditors." (Id.)

4

Hall and Malone now appeal.

II. Standard of Review

We review a grant of summary judgment de novo . United States v. Kanasco, Ltd., 123 F.3d 209, 210 (4th Cir. 1997). The moving party must demonstrate that there exists no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 322-23 (1986). We consider the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

III. Discussion

On appeal, Hall and Malone contend that the district court erred both in reading Fredericksburg Lumber as prescribing a duty to creditors, and in applying that putative duty to the facts of the instant case. We disagree. Fredericksburg Lumber allows a creditor to recover in equity assets of an execution-proof corporation that have been improperly distributed to shareholders, and we think that the principles of that case allow recovery here.

A. Fredericksburg Lumber[3]

The plaintiff in Fredericksburg Lumber was one Neff, who secured a judgment against a corporation for a debt that first arose in 1919. Three years later, after failing to collect his judgment from the execution-proof corporation, Neff filed a bill in equity seeking to establish that the corporation's officers and directors possessed funds of the corporations and to subject these funds to the payment of the corporation's debt to Neff. In between the creation of the debt and the commencement of litigation, Neff alleged that the directors had, "with intent to defraud," caused the corporation to use its funds to repurchase the stock held by two of the directors at a time when "the corporation was insolvent." See Fredericksburg Lumber, 173 S.E. at 555.

_____

[3] The district court also relied on FDIC v. Sea Pines, supra. However, in that case, this court applied the law of South Carolina, not Virginia. While a Virginia court might find Sea Pines and its South Carolina antecedents persuasive, it is unclear to what extent it would do so, and for that reason we base our analysis on Fredericksburg Lumber.

5

The Chancery Court ruled in Neff's favor, holding personally liable the two directors whose stock the corporation repurchased as well as the director who endorsed the note for which the stock was exchanged (the other two directors were this director's wife and daughter). See id.

The Virginia Supreme Court, over one dissenting vote, amended the equity decree and affirmed. The Court framed the questions presented as follows:

> Was Neff a creditor of the corporation in August 1919 when the sale of stock was made? Did the corporation buy its own stock through Edgar Marshall, the president, from Ida P. Marshall, vice-president and director, and Virginia Gregory, a director with corporate funds?

Id. at 556. The Court reasoned that "[a]n affirmative answer to these questions, which we think are determinative, will lead to an affirmation of the decree." Id. The Court then pointed out one other condition for liability that was clearly satisfied: the corporation's inability to pay its debts:

> Whether the corporation was solvent or insolvent at the time [of the stock repurchase] has no material bearing. When the creditor, Neff, sought to collect his debt, which had been reduced to judgment in 1922, the corporation was then execution proof and had no assets from which the judgment and execution could be satisfied.

Id. Together, these two passages suggest that shareholders of an execution-proof corporation will be liable to creditors for distributions of the corporation's capital assets. The question before the Fredericksburg Lumber Court was whether this rule applied to the corporation's at-par repurchase of its directors' shares.

The Court answered this question in the affirmative, concluding that the shareholders were liable for payments from the corporation in exchange for stock. "[T]he effect of the transaction" on Neff, the creditor, was that the corporate funds, "upon which he had a right to

6

rely for the payment of his debt[,] were diverted from corporate purposes and placed beyond his reach." Id. at 557. "The capital assets were diminished to that extent and no consideration for those assets was received by the corporation." Id.

The court then amended the decree to negate the liability of Edgar Marshall, the director who caused the corporation to execute the repurchase but who "did not personally receive any benefit from the transaction." 173 S.E. at 558.

B. The Trust Fund Doctrine

Hall and Malone claim that Fredericksburg Lumber was really a fraudulent conveyance case, "stand[ing] only for the proposition that a transfer of corporate assets to a shareholder without consideration is a fraud on corporate creditors." But we are unable to construe Fredericksburg Lumber as resting upon fraudulent conveyance law.[4] The Virginia Supreme Court nowhere used the term"fraudulent conveyance," even though in 1934, when Fredericksburg Lumber was decided, the Virginia fraudulent conveyance statute had been in effect for many years,[5] and there were numerous contemporary cases inter-

_____

[4] If true, this argument would help Hall and Malone because Rapids' complaint did not include a cause of action for fraudulent conveyance. Hall and Malone go on to contend that even if Rapids had claimed a fraudulent conveyance, it would be unable to obtain a personal judgment under Cheatle v. Rudd's Swimming Pool Supply Co., 360 S.E.2d 828 (1987). This contention is problematic, as the Virginia Supreme Court has recently held in Price v. Hawkins, 439 S.E.2d 382, 385 (Va. 1994), that a personal judgment is proper under Va. Code§ 55-80 if the creditor would otherwise be "without any effective remedy."

[5] The current fraudulent conveyance statute provides:

> Every gift, conveyance, assignment or transfer or, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigned, be void. This section shall not affect the title of a purchaser for

7

preting the statute. The Court's failure to mention the statute, or the familiar language of "intent to delay, hinder or defraud creditors," strongly suggests that it was not relying on the fraudulent conveyance statute.

Instead, Fredericksburg Lumber appears to rest on the "trust fund doctrine." The doctrine was described as follows in Ashworth v. Hagan Estates, Inc., 181 S.E. 381 (Va. 1935):

> "The authorities seem to be uniform to the effect that the assets of the corporation are subject to an equitable lien in favor of the creditors, and that such creditors may follow such assets, or the proceeds thereof, into whatsoever hands they can trace them and subject them to such debts, except as against a bona fide purchaser for value. And where a corporation transfers all its assets to another corporation with a view of going out of business, and nothing is left with which to pay its debts, such transferee is charged with notice by the very circumstance of the transaction, and takes the same cum onere. Such a case cannot be considered a sale in the due course of business even though based on a valuable consideration, as it operates as a fraud against the creditors."

Id. at 385 (quoting Williams v. Commercial National Bank, 90 P. 1012, 1015 (Or. 1907)); see also Zolman Cavitch, 14 Business Organizations § 190.02[2][c], at 190-91 (1993) (describing doctrine); 4B Michie's Jurisprudence of Virginia and West Virginia § 269, at 592-93 (1986) (same). In short, the trust fund doctrine gives creditors an equitable right of recovery against shareholders who take assets from a dissolving corporation.

_____

> valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Va. Code § 55-80. The statute's language dates back, in its entirety, to the time of Fredericksburg Lumber. See, e.g., Artrip v. Kelly, 134 S.E. 690, 690 (1926) (quoting § 55-80's predecessor, § 5184 of the 1919 Virginia Code).

8

Fredericksburg Lumber applied this doctrine to a corporation's repurchase of controlling shareholders' stock. Indeed, the stock repurchase in Fredericksburg Lumber amounted to a liquidation, as the cash exchanged for the repurchased stock represented the "only assets of the corporation." 173 S.E. at 555. As a result, there were "no assets out of which [the creditor's] claim can be collected." Id. at 558.

Subsequent Virginia authority is consistent with this view. The two Virginia state court decisions citing to Fredericksburg Lumber do so for the proposition that "`a corporation has no right to purchase its own shares if the substantial rights of either stockholders or creditors will be adversely affected thereby.'" Marcuse v. Broad-Grace Arcade Corp., 180 S.E. 327, 337 (Va. 1935) (quoting Kemp v. Levinger, 174 S.E. 820, 827 (Va. 1934), and citing Fredericksburg Lumber); Kemp, 174 S.E. at 827 (also citing Fredericksburg Lumber). Other courts citing Fredericksburg Lumber have done so in other contexts, such as bankruptcy, that are less relevant here. See, e.g., In re Kane, 1997 WL 781645, *3 (Bankr. E.D. Va. Dec. 4, 1997) (citing Fredericksburg Lumber for the proposition that "[w]hen[debtor-in-possession under Chapter 13] dissolved the Corporation, the vehicles should have been released to the Creditors in satisfaction of the debt incurred by the Corporation").

Although Fredericksburg Lumber has not been cited by a Virginia court since 1935, it has never been overruled and Hall and Malone do not question its continued validity. See, e.g. , Gilstrap v. Amtrak, 998 F.2d 559, 562 (8th Cir. 1993) (following 80-year-old state court decision despite lack of recent citation); In re Ryan, 851 F.2d 502, 508-09 (1st Cir. 1988) (following 1869 state-court decision absent "persuasive" evidence that state supreme court would rule differently); Simmons v. Hartford Ins. Co., 786 F. Supp. 574, 580 (E.D. La. 1992) ("[T]he Louisiana Supreme Court has spoken, albeit over one hundred years ago. Since the Louisiana Court has spoken, this Court need not speculate as to whether it might rule differently today."); see generally 19 Charles A. Wright et al., Federal Practice and Procedure § 4507, at 141, 145, & 147 (1996) (explaining that "[e]ven if . . . [diversity court views state precedent as] anomalous, antiquated, or simply unwise, it must be followed . . . unless there are very persuasive grounds for believing that the state's highest court no

9

longer would adhere to the previously announced principle") (footnotes omitted).

We conclude that <u>Fredericksburg Lumber</u> remains valid and controlling Virginia authority.**6**

C. <u>Application of the Trust Fund Doctrine</u>

The district court reasoned that even though the corporation paid Malone and Hall no cash, Rapids could, under <u>Fredericksburg Lumber</u>, recover the write-off against shareholder receivables. Here, as in <u>Fredericksburg Lumber</u>, controlling shareholders caused the corporation to purchase their stock; this reduced the corporation's receivables, leaving it unable to pay the outstanding claim of a judgment lien creditor.**7**

Malone and Hall try to distinguish their case from <u>Fredericksburg Lumber</u> on several grounds. First, they point out that, unlike the shareholders in <u>Fredericksburg Lumber</u>, they received a forgiveness of debt rather than cash in exchange for the stock. We conclude that distinction is not of controlling significance. The trust fund doctrine, both generally and in Virginia, allows creditors to satisfy their claims out of shareholder debts such as unpaid stock subscriptions. <u>See</u> <u>Martin v. South Salem Land Co.</u>, 26 S.E. 591, 598 (Va. 1896); 4B <u>Michie's Jurisprudence of Virginia and West Virginia</u> § 269, at 593

---

**6** The parties have not argued, and so we have not considered, whether <u>Fredericksburg Lumber</u> has been eroded by Virginia's statutory enactments in the corporate area. <u>See</u> Va. Code§§ 13.1-746 & -747 (giving creditor a right to petition court for involuntary dissolution of insolvent corporation and prescribing priority of distribution of assets). Arguably the statute takes the place of an equitable lien based upon "trust fund" principles. However, it can also be argued that the trust fund doctrine remains a viable alternative to any statutory remedy. Given the parties' failure to pursue this issue, we do not enter the thicket.

**7** Also, the district court averted briefly to other payments Hall and Malone caused ADCO to transfer to themselves and other businesses; these constituted a separate basis for the district court's grant of summary judgment under <u>Fredericksburg Lumber</u>. In light of our discussion herein, we need not reach this aspect of the decision below.

10

("Within the meaning of [the trust fund doctrine], unpaid subscriptions to the corporate stock constitute a part of the corporate assets, and in this sense of the `trust fund' doctrine constitutes a trust fund for the payment of creditors."). Thus, like a cash payment, the reduction in Malone's and Hall's liability to the corporation dissipated the corporation's assets.

Second, Appellants point out that even after the stock repurchase, they still owed the corporation (in the form of "shareholder receivables") over $100,000 -- more than enough to satisfy Rapids' entire claim. By contrast, in Fredericksburg Lumber, the payment to shareholders comprised the company's "only assets." 173 S.E. at 558. Here, Hall and Malone reason, the rule of Fredericksburg Lumber would not apply until the corporate assets can be shown to have been reduced so as to be insufficient to pay its liabilities. However, the court in Fredericksburg Lumber stated that "[w]hether the corporation was solvent or insolvent at the time [the debt was first incurred] has no material bearing. When the creditor, Neff, sought to collect his debt . . ., the corporation was then execution proof and had no assets from which the judgment and execution could be satisfied." 173 S.E. at 555.

Malone and Hall contend that the stock repurchase here did not render ADCO "execution proof," since there is no evidence of an execution returned unsatisfied. However, Malone testified under oath that the corporation was unable to pay its financial obligations, and there has been no suggestion by anyone that, since Rapids first obtained its judgment against ADCO, the corporation has been willing and able to pay Rapids' judgment. All the evidence indicates that ADCO is now a non-functional corporate shell. We do not think it lies in the mouth of ADCO's sole shareholders, Hall and Malone, who have steadfastly resisted responsibility for ADCO's indebtedness, to contend that their own shareholders' liabilities to the corporation render this suit superfluous. ADCO's demonstrated incapacity in these circumstances to satisfy the judgment constitutes ample grounds for applying Fredericksburg Lumber's equitable doctrine and granting relief against Malone and Hall.

IV. Conclusion

The judgment against Malone and Hall is affirmed.

AFFIRMED

11